**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RACHIEM GODFREY,** | : | |
| **Plaintiff** | : | **CIVIL ACTION NO. 3:22-cv-892** |
| **v.** | : | **(JUDGE MANNION)** |
| **GEORGE LITTLE, *et al.*,** | : | |
| **Defendants** | : | |

## <u>ORDER</u>

During the COVID-19 global pandemic, *pro se* Plaintiff Rachiem Godfrey ("Godfrey"), who declined to take the COVID-19 vaccine, spent more than seven (7) months in a restricted confinement housing unit with other unvaccinated state prisoners. He then brought this action against various prison officials in which he raises claims under 42 U.S.C. §1983 that his placement in restricted confinement for that period violated his right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution and his right to procedural due process under the Fourteenth Amendment. Godfrey also asserts a Pennsylvania state-law claim for intentional infliction of emotional distress ("IIED") against those prison officials.

Currently before the Court is Defendants' motion for summary judgment in which they argue that there are no genuine disputes of material

fact and, therefore, they are therefore entitled to judgment as a matter of law on all claims asserted against them. Godfrey did not file a response to this motion. For the reasons stated below, the Court concludes that Defendants are entitled to summary judgment on Godfrey's Section 1983 claims. The Court will also decline to exercise supplemental jurisdiction over Godfrey's state-law IIED claim and will dismiss it without prejudice to him reasserting it in the appropriate Pennsylvania state court.

## I. BACKGROUND

Godfrey, a convicted and sentenced state prisoner, commenced this action by filing a complaint, an application for leave to proceed *in forma pauperis*, and an uncertified prisoner trust fund account statement, all of which the Clerk of Court docketed on June 7, 2022. (Docs. 1–3.) In his complaint, Godfrey named as Defendants: (1) George Little ("Little"), former Superintendent of the Commonwealth of Pennsylvania Department of Corrections ("DOC");[1] (2) John Wetzel ("Wetzel"), then-Superintendent of the DOC; (3) Thomas McGinley ("McGinley"), the Superintendent of Pennsylvania State Correctional Institution Coal Township ("SCI Coal Twp."); (4) Jeffrey Gibson ("Gibson"), a Deputy Superintendent at SCI Coal

---

[1] Godfrey incorrectly lists Little's first name as "Steven" in the complaint.

Twp.; and (5) Anthony Luscavage ("Luscavage"), another Deputy Superintendent at SCI Coal Twp. (Doc. 1 at 1–3.) Godfrey appeared to assert claims under 42 U.S.C. §1983 against Defendants for violations of his rights under the First and Fourteenth Amendments to the United States Constitution, as well as claims for violations of the Pennsylvania Constitution. (*Id.* at 14.)

Due to deficiencies in Godfrey's *in forma pauperis* filings, Administrative Orders issued requiring him to submit a proper *in forma pauperis* application and certified prisoner trust fund account statement in accordance with 28 U.S.C. §1915(a). (Docs. 6, 10); *see also* 28 U.S.C. §1915(a)(1)–(2) (allowing federal courts to permit prisoner-plaintiffs to proceed *in forma pauperis* if they, *inter alia*, "submit[] an affidavit that includes a statement of all assets such [they] possess[ showing] that [they are] unable to pay such fees" as well as "a certified copy of the trust fund account statement (or institutional equivalent) for the prisoner for the 6-month period immediately preceding the filing of the complaint . . ., obtained from the appropriate official of each prison at which the prisoner[-plaintiff] is or was confined"). Godfrey ultimately submitted a proper application for leave to proceed *in forma pauperis* ("IFP Application") and a certified account statement (Docs. 9, 11), and the Court granted the IFP Application through

an Order entered on September 29, 2022 (Doc. 12). In the same Order, the Court directed the Clerk of Court to send copies of the complaint and waiver of service forms to Defendants. (*Id.* at 2.)

Defendants waived service. (Doc. 14.) They also waived a reply to the complaint pursuant to 42 U.S.C. §1997e(g), while still asserting affirmative defenses to it. (Doc. 17); *see also* 42 U.S.C. §1997e(g) ("Any defendant may waive the right to reply to any action brought by a prisoner confined in any . . . correctional facility under section 1983 . . . . Notwithstanding any other law or rule of procedure, such waiver shall not constitute an admission of the allegations contained in the complaint. No relief shall be granted to the plaintiff unless a reply has been filed."). Defendants then filed a motion to take Godfrey's deposition along with a supporting brief on November 28, 2022. (Docs. 18, 19.)

On December 14, 2022, Godfrey filed a motion for leave to file an amended complaint. (Doc. 20.) Two (2) days later, the Court entered an Order (1) granting Godfrey's motion; (2) providing him with leave until February 25, 2023, to file an amended complaint; and (3) dismissing Defendants' motion to depose Godfrey without prejudice to them renewing the motion after he filed his amended complaint. (Doc. 21.) Godfrey timely filed an amended complaint on February 16, 2023. (Doc. 22.)

In his amended complaint, Godfrey names as Defendants Little, Wetzel, McGinley, Gibson, and Luscavage, as well as SCI Coal Township Correctional Officers Ms. Hilton ("Hilton") and Zales ("Zales"). (*Id.* at 1.) He sues all Defendants in their individual and official capacities. (*Id.* at 2.)

Godfrey's allegations relate to SCI Coal Twp.'s actions in response to the COVID-19 pandemic. (*Id.* ¶4.) He avers that in 2020, SCI Coal Twp. responded to the pandemic by instituting a lockdown. (*Id.*) In the summer of 2021, SCI Coal Twp. made Johnson & Johnson's COVID-19 vaccine available to the inmates and correctional staff. (*Id.*) Shortly thereafter, McGinley informed the inmates that the lockdown would be lifted once they reached "herd immunity," meaning that 80% or more of the inmates and correctional staff had received the vaccine. (*Id.*) SCI Coal Twp. eventually reached "herd immunity," consequently, the lockdown was lifted in July 2021, and the prison's common areas reopened. (*Id.*) However, all inmates and staff were required to wear masks. (*Id.*)

On September 21, 2021, Godfrey declined to be vaccinated. (*Id.*) At the time, Godfrey was housed in the Restricted Housing Unit ("RHU"). (*Id.*) McGinley told Godfrey that due to his unvaccinated status, he would be moved "out of his current cell-block [sic] and placed into quarantine isolation in J-Block where only unvaccinated inmates were housed." (*Id.*) When

Godfrey was moved from the RHU, "he was forced to receive[] the nasal swab, [which] felt like something exploded in his head and [caused] excruciated [sic] pain in his nostril." (*Id.*)

Once Godfrey was moved to J-Block, he was only permitted to leave his cell for forty-five (45) minutes a day to shower, use the phone, and access the "kios [sic]." (*Id.*) He also was not allowed to use the law library, have any contact visits, attend school, use the water fountain, or leave his housing unit. (*Id.*) Further, Hilton and Zales "deliberately neglect[ed] to provide [Godfrey] with [his] daily meals on a daily basis." (*Id.* ¶12.)

Godfrey alleges that the policy to segregate vaccinated and unvaccinated inmates at SCI Coal Twp. was initiated by Wetzel and continued by Little. (*Id.* ¶8.) McGinley, Gibson, and Luscavage shared this policy with Godfrey through a memorandum he received when he was housed in J-Block. (*Id.* ¶9.) McGinley also came into J-Block on October 24, 2021, to talk to Godfrey and the other unvaccinated inmates housed there. (*Id.* ¶12.) At that time, Godfrey and other inmates voiced their concerns about what they believed was unequal treatment and deprivation of their liberty in violation of their constitutional rights. (*Id.*) McGinley asked Godfrey to explain how he was being treated differently, what kind of pain was being inflicted upon him, what liberty interest was being deprived, and what acts did

Godfrey believe constituted deliberate indifference. (*Id.* ¶13.) In response, Godfrey pointed out the following differences between his treatment and the vaccinated inmates' treatment: (1) he was forced to switch cells; (2) he was forced to have a new cellmate, with whom he did not get along; (3) he was denied the ability to submit a cellmate change request, "which are used statewide in all SCI's [sic] to pair inmates who are compatible and upon agreement/consent to avoid . . . putting . . . inmates into [sic] an unsafe or undesirable environment/cell assignments with other inmates"; (4) he was denied access to the gym, the law library, filtered water, the unit counselor for timely guidance, and religious services "during the easing stage of the pandemic"; (5) he could not have pictures, photos, or in-person contact visits "during the easing stage of the pandemic"; (6) J-Block staff, such as Hilton and Zales, "were intentionally denying [him a] food tray for not getting up in time or if [he] was asleep they would just walk[] on by and not provide [him] with [his] daily nutritions [sic]/meals (breakfast/lunch or dinner); and (7) he was locked in a 12 x 8 cell for twenty-three (23) hours a day and only allowed outside of his cell for one (1) hour. (*Id.* ¶14.)

On November 5, 2021, a block officer moved Godfrey from "J-A-23 cell to J-A-31[]cell." (*Id.* ¶16.) During the move, Godfrey told Zales that he did not get along with the inmate currently in J-A-31 cell and that Zales was "putting

him in an unsafe and hostile environment." (*Id.* ¶17.) Godfrey also informed Zales "of the possible altercation and physical fight that may or can occur," and Zales responded "good." (*Id.*) Zales also told Godfrey that "this is a direct order[,] not a request[,] move into the cell or go to the [RHU]." (*Id.*) Being faced with the choice of either living "without someone [who he is] uncomfortable with or disobey[ing] a direct order and go[ing] to the [RHU]" caused Godfrey "a lot of mental [and] emotional distress." (*Id.*)

On the same date, Godfrey "filed his initial grievance to exhaust [his] administrative remedies . . . ." (*Id.* ¶20.) This grievance "went unanswered for months." (*Id.* ¶21.) When the DOC staff "choose not to answer [his] grievance in a mannerable [sic] time[, he] had no choice[] and was forced to file" his civil complaint in this case "to redress [his] concerns/[c]onstitutional violations." (*Id.* ¶22.)

Godfrey asserts that Defendants' conduct "caus[ed him] to continue experiencing anxiety, sleepless nights, headache [sic], migraine [sic], stomach cramps, muscle cramps, mental [and] emotional distress." (*Id.* at 6.) He also "suffered psychological and physical harms, including psychosis, trauma, severe depression, serious self-injuries, and suicide [sic]." (*Id.* at 6–7.)

Based on these allegations, Godfrey asserts claims against Defendants under Section 1983 for "deprivation of a state-created liberty interest,"[2] "cruel & unusual punishment," and "failure to intervene." (*Id.* at 7–9.) Godfrey also asserts a state-law cause of action for IIED. (*Id.* at 9.) For relief, Godfrey seeks compensatory damages, punitive damages, and a declaratory judgment stating that his constitutional rights were violated. (*Id.* at 9–10.)

Defendants waived the right to reply to the amended complaint pursuant to Section 1997e(g) and asserted affirmative defenses to the amended complaint on March 2, 2023. (Doc. 25.) On the same date, Defendants filed a motion to depose Godfrey and a supporting brief, and the Court granted this motion on March 3, 2023. (Docs. 26, 27, 29.) On June 22, 2023, the Court issued a Scheduling Order establishing a discovery deadline of September 5, 2023, and a dispositive motions deadline of October 5, 2023. (Doc. 30.)

Godfrey filed a motion for appointment of counsel on July 10, 2023 (Doc. 31), which the Court denied by an Order entered the following day (Doc. 33). Godfrey filed a motion for reconsideration of this Order on August

---

[2] The Court construes this cause of action for a "deprivation of state-created liberty interest," as a claim that Defendants violated his procedural due process rights under the Fourteenth Amendment.

1, 2023 (Doc. 34), which the Court denied on August 21, 2023 (Doc. 36). On October 5, 2023, Defendants filed the instant motion for summary judgment, a brief in support of their motion, a statement of material facts, and an appendix of exhibits. (Docs. 38–41.) Godfrey has never responded to this motion or sought an extension of time to do so. As such, Defendants' motion for summary judgment is ripe for disposition.

## II.    LEGAL STANDARDS

### A.    Motion for Summary Judgment Under Federal Rule of Civil Procedure 56

Summary judgment is appropriate "if the pleadings, the discovery [including, depositions, answers to interrogatories, and admissions on file] and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990). A factual dispute is genuine if a reasonable jury could find for the non-moving party and is material if it will affect the outcome of the trial under governing substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Aetna Cas. & Sur. Co. v. Ericksen*, 903 F. Supp. 836, 838 (M.D. Pa. 1995).

At the summary judgment stage, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *see also Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) ("In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence . . . ."). Rather, the Court must consider all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. *See Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007).

To prevail on summary judgment, the moving party must affirmatively identify those portions of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323–24. The moving party can discharge that burden by showing that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003); *see also Celotex*, 477 U.S. at 325. If the moving party meets this initial burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts," but must show sufficient evidence to support a jury verdict in its favor. *Boyle v. Cnty. of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998) (quoting *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). However, if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial, Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322–23; *see also Jakimas v. Hoffman-La Roche, Inc.*, 485 F.3d 770, 777 (3d Cir. 2007).

## B.   Section 1983

Section 1983 is the statutory vehicle by which private citizens may seek redress for violations of federal constitutional rights committed by state officials. *See* 42 U.S.C. §1983. This statute states in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution or laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

*Id.* "[Section] 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490 U.S. 386, 393–94 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). "To state a claim under §1983, a plaintiff must allege the violation of a right secured by the Constitution and

laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

## III.    DISCUSSION

Defendants move for summary judgment on several grounds. First, they assert that they are entitled to summary judgment on Godfrey's Section 1983 official-capacity claims because the Eleventh Amendment precludes official-capacity claims against them for monetary damages, and they are not "persons" amenable to suit under Section 1983. (Doc. 39 at 7.) Second, they contend that they are entitled to summary judgment due to Godfrey's failure to exhaust his administrative remedies. (*Id.* at 8–10.) Third, they argue that summary judgment should be entered in favor of Wetzel and Little because of their lack of personal involvement in any alleged wrongdoing. (*Id.* at 10–11.) Fourth, they assert that they are entitled to summary judgment on Godfrey's IIED claim against them because he failed to present any supporting medical evidence. (*Id.* at 11–12.) Fifth, they contend that the Court should grant them summary judgment on Godfrey's due process claims because the evidence in the record does not show any due process violation. (*Id.* at 12–16.) Sixth, they maintain that they are entitled to summary judgment on Godfrey's cruel-and-unusual-punishment claims

because Godfrey has not shown that he was deprived of the minimal civilized measure of life necessities. (*Id.* at 16–17.) Seventh, and finally, they argue that they are entitled to summary judgment on Godfrey's failure-to-intervene claims because he failed to show that his constitutional rights were violated and, as such, they had no duty to intervene. (*Id.* at 17.)

As explained below, the Court finds that Defendants are entitled to summary judgment on Godfrey's Section 1983 claims. In addition, the Court will decline to exercise supplemental jurisdiction over his IIED claim and dismiss it without prejudice to Godfrey refiling the claim in the appropriate state court.

## A.    Material Facts

### 1.    Application of Local Rule 56.1

In accordance with Local Rule 56.1, Defendants filed a statement of material facts in support of their motion for summary judgment. (Doc. 40); *see* M.D. Pa. L.R. 56.1 ("A motion for summary judgment filed pursuant to Fed. R. Civ. P. 56, shall be accompanied by a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried."). Godfrey did not file a counter statement of material facts, responding to the numbered paragraphs set forth in Defendants' statement, as required by Local Rule

56.1. *See id.* ("The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth in the [moving party's statement], as to which it is contended that there exists a genuine issue to be tried."). Godfrey's failure to file a counter statement is not excused simply because he is proceeding *pro se* as the Local Rules and Federal Rules of Civil Procedure apply with equal force to all parties. *See Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013) (explaining that *pro se* parties "cannot flout procedural rules—they must abide by the same rules that apply to all other litigants").

Due to Godfrey's failure to file a counter statement, Defendants' material facts identified in their statement are deemed admitted because:

> A failure to file a counter-statement equates to an admission of all the facts set forth in the movant's statement. [Local Rule 56.1] serves several purposes. First, it is designed to aid the Court in its determination of whether any genuine issue of material fact is in dispute. Second, it affixes the burden imposed by Federal Rule of Civil Procedure 56(e), as recognized by *Celotex Corp. v. Catrett*, on the nonmoving party "to go beyond the pleadings and by [their] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, *designate specific facts showing that there is a genuine issue for trial*." 477 U.S. 317, 324 (1986) (internal quotation marks omitted) (emphasis added).

*Doe v. Winter*, No. 04-cv-2170, 2007 WL 1074206, at *1 n.2 (M.D. Pa. Apr. 5, 2007).

Although Defendants' facts set forth in their statement are deemed admitted due to Godfrey's failure to comply with Local Rule 56.1, the Court cannot summarily grant their motion as unopposed. Instead, summary judgment may only be granted if the Court "find[s] that judgment for the moving party is 'appropriate.'" *Anchorage Assocs. v. V.I. Bd. of Tex Rev.*, 922 F.2d 168, 175 (3d Cir. 1990). The analysis for determining whether judgment is "appropriate" depends on whether the party moving for summary judgment bears the "burden of proof on the relevant issues":

> Where the moving party has the burden of proof on the relevant issues, this means that the district court must determine that the facts specified in or in connection with the motion entitle the moving party to judgment as a matter of law. Where the moving party does not have the burden of proof on the relevant issues, this means that the district court must determine that the deficiencies in the opponent's evidence designated in or in connection with the motion entitle the moving party to judgment as a matter of law.

*Id.* (citing *Celotex Corp.*, 477 U.S. 317).

## 2.    The DOC's Inmate Grievance System

Since at least May 1, 2015, the DOC has maintained an Inmate Grievance System (DC-ADM 804), which provides "every individual committed to its custody [with] access to a formal procedure through which to seek resolution of problems or other issues of concern arising during the course of [their] confinement." (Docs. 40 ¶7; 41-1 at 5–35; 41-7 ¶¶4, 7.) This

System "is intended to deal with a wide range of issues, procedures, or events that may be of concern to an inmate." (Doc. 41-1 at 9.)

Except in circumstances where an inmate is alleging physical or sexual abuse, the inmate is encouraged to resolve their problems or concerns informally. (*Id.*) They can do so through a "direct conversation with the Unit Manager or Officer-in-Charge" or by completing and submitting an Inmate Request to Staff Member form. (*Id.*) If the inmate is unable to resolve their issue informally, they are required to comply with DC-ADM 804's three (3)-step grievance process. (Docs. 40 ¶8; 41-1 at 5, 9–26; 41-7 ¶5.)

For the first step, the inmate must submit a grievance using the DC-804, Part 1 form, to the "Facility Grievance Coordinator/designee, usually the Superintendent's Assistant, [at the institution where the issue arose,] within 15 working days after the event upon which the claim is based." (Docs. 40 ¶¶8–9; 41-1 at 9–10; 41-7 ¶¶ 5–6.) As for the contents of the grievance:

> The text of the grievance must be legible, understandable, and presented in a courteous manner. The inmate must include a statement of the facts relevant to the claim.
>
> a. The statement of facts shall include the date, approximate time, and location of the event(s) that gave rise to the grievance.
>
> b. The inmate shall identify individuals directly involved in the event(s).

  c. The inmate shall specifically state any claims he/she wishes to make concerning violations of [DOC] directives, regulations, court orders, or other law.

  d. If the inmate desires compensation or other legal relief normally available from a court, the inmate must request the specific relief sought in his/her initial grievance.

(Doc. 41-1 at 10); *see also* (Docs. 40 ¶11; 41-7 ¶8).

  Following the submission of the initial grievance, the Grievance Coordinator/Designee must "assign a grievance tracking number to [it] . . . and enter [it] into the Automated Inmate Grievance Tracking System." (Doc. 41-1 at 14.) The Grievance Coordinator/Designee will then review the grievance to determine whether it was "properly submitted" in accordance with DC-ADM 804's procedures. (*Id.*) If the grievance was improperly submitted, the Grievance Coordinator/Designee will "reject[] and return[ it] to the inmate with a Grievance Rejection Form enumerating the reason(s) the grievance was rejected." (*Id.* at 15 (boldface omitted)). On the other hand, if the inmate properly submitted the grievance, the Grievance Coodinator/Designee will designate a staff member who was not "directly involved *in* or named as the subject of the grievance" as the Grievance Officer for that grievance. (*Id.* at 14.)

  The Grievance Officer must provide a response to the inmate, using the Initial Review Response Form, "within 15 working days from the date the

[inmate's] grievance was entered into the Automated Inmate Grievance Tracking System." (*Id.* at 15.) This response "shall include a brief rationale for summarizing the conclusion and any action take or recommended to resolve every issue raised as well as any requested relief" and "must include one of the following dispositions: Uphold Inmate, Grievance Denied or Uphold in Part/Deny in Part." (*Id.*)

If the grieving inmate is dissatisfied with the Initial Review Response, they must proceed to the second step of DC-ADM 804 by filing an appeal to the Facility Manager/Designee within fifteen (15) days from the date of the Initial Review Response. (Docs. 40 ¶¶8–9; 41-1 at 18; 41-7 ¶¶5–6.) The Facility Manager must then "notify the inmate using the Facility Manager's Appeal Response . . . of his/her decision within fifteen (15) working days of receiving the appeal." (Doc. 41-1 at 19.) The Appeal Response must contain "one of the following dispositions . . .: Uphold Response; Uphold Inmate; Dismiss/Dismiss Untimely or Uphold in Part/Deny in Part." (*Id.*)

An inmate who is dissatisfied with the disposition of an appeal to the Facility Manager must then file an "appeal to final review" to the DOC Secretary's Office of Inmate Grievances and Appeals ("SOIGA") within fifteen (15) working days from the date of the Facility Manager's decision. (*Id.* at 21; Docs. 40 ¶¶8–9; 41-7 ¶¶6–7.) "Only issues ***raised in the initial***

- 19 -

*grievance and/or* appealed to the Facility Manager may be appealed to Final Review." (*Id.*) Upon its receipt of the Final Review appeal, SOIGA has thirty (30) working days to respond unless there is an extension of its response time. (Doc. 41-1 at 24.)

### 3.   Godfrey's Use of the Inmate Grievance System at SCI Coal Twp.[3]

Godfrey was in the unvaccinated unit in J-Block from September 21, 2021, through May 2, 2022. (Doc. 40 ¶ 37.) While housed on J-Block, Godfrey had four (4) or five (5) blank grievance forms in his cell. (Doc. 41-9

---

[3] Godfrey's amended complaint, which is verified (Doc. 22 at 11 ("I Rachiem Godfrey, hereby verify and swear under the penalty of perjury that the facts set forth are true and correct except those upon information and belief upon which I still believe to be true.")), can be considered as an affidavit in determining whether a genuine issue of material fact exists at summary judgment. *See McKay v. Krimmel*, No. 22-1302, 2023 WL 4231714, at *2 n.4 (3d Cir. June 28, 2023) (unpublished) ("A verified complaint may be treated as an affidavit with evidentiary value at the summary-judgment stage. However, it cannot create a genuine dispute of material fact if contradicted by the story told by discovery." (citations and internal quotation marks omitted)); *Revock v. Cowpet Bay W. Condo. Ass'n*, 853 F.3d 96, 100 n.1 (3d Cir. 2017) ("[W]e consider as affidavits Walters and Kromenhoek's sworn verified complaints, to the extent that they are based upon personal knowledge and set out facts that would be admissible in evidence."); *see also* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."); *cf.* 28 U.S.C. §1746 (providing requirements for sworn affidavits, declarations, certificates, statements, and verifications). As such, the Court will cite to the amended complaint where necessary to set forth the factual background for summary judgment purposes.

at 25.) Godfrey used two (2) of those grievance forms to submit grievances relating to certain health issues he experienced in February and April 2022. (*Id.* at 25–27, 31; Doc. 40 ¶¶12–13.) These two (2) grievances were among the one hundred and fifty-one (151) grievances filed and processed from J-Block while it was being used as the unvaccinated housing unit from August 9, 2021, through April 18, 2022. (Doc. 40 ¶¶15–16.)

Even though Godfrey was placed in J-Block due to his unvaccinated status on September 21, 2021, he did not submit a grievance about this placement there until he allegedly did so on November 5, 2021. (Doc. 22 ¶20; Doc. 41-9 at 26–27, 34–35.) Godfrey asserts that he did not submit the grievance until November 5th because the differences in conditions for unvaccinated inmates there went beyond his expectations. *See* (*id.* at 35 ("[W]hen I was [in J-Block], I was understanding like, okay, we're not vaccinated. It's going to be a little bit different. But it was just like too different, unfair.")). Godfrey explained that "as time [went] on, . . . it just didn't feel right [in J-Block]." (*Id.*)

Godfrey alleges that he placed this November 5, 2021 grievance in a locked grievance box. (Doc. 41-9 at 28, 31.) He believes that the unit manager would collect the lockboxes and obtain all the grievances stored therein. (*Id.*)

Bryan Toms ("Toms") was the J-Block Unit Manager from August 2021 until November 10, 2021, as well as from January 2022 to March 2022. (Doc. 40 ¶19.) During those periods, if a J-Block inmate wanted to submit a grievance under DC-ADM 804, they would complete the grievance form and place it in a locked box. (*Id.* ¶20.) Toms had the key to this locked box. (*Id.* ¶21.)

On an "almost daily" basis from Monday through Friday, Toms would open the locked box, collect the grievances submitted, and place them in a folder marked "Superintendent's Office" on a secured mail cart. (*Id.* ¶22.) The mail cart would deliver the grievances along with other mail to the Superintendent's Office. (*Id.* ¶23.) Toms always forwarded every grievance in the locked box in such a manner. (*Id.* ¶24.) If Godfrey had submitted a grievance on Friday, November 5, 2021, Toms would have processed said grievance by Tuesday, November 9, 2021. (*Id.* ¶25.)

For many years until retiring in January 2022, Tricia Kelley ("Kelley") was the Assistant to the Superintendent at SCI Coal Twp. (*Id.* ¶26.) As part of her responsibilities, Kelley reviewed, tracked, and referred all grievances filed at SCI Coal Twp. to an appropriate grievance officer. (*Id.* ¶27.) If Godfrey had submitted his November 5, 2021 grievance and it was delivered to the Superintendent's Office, Kelley would have reviewed it, processed it by

- 22 -

assigning it a grievance number, entered it into the CAPTOR Grievance Tracking System, and either rejected it if it did not comply with the requirements of DC-ADM 804 or assigned it to a Grievance Officer to investigate and prepare a response to the grievance. (*Id.* ¶28.) A copy of the grievance with the assigned tracking number would then have been returned to Godfrey. (*Id.* ¶29.)

Kelley processed all grievances she received in the above manner. (*Id.* ¶30.) As such, she asserts that the Superintendent's Office never received Godfrey's grievance dated November 5, 2021 because it is not listed in the CAPTOR Grievance Tracking System. (*Id.* ¶¶14, 31; Docs. 41-2 at 2; 41-4 at 2–5; 41-6 ¶¶ 7, 10.) However, other J-Block inmates' grievances, including those raising issues related to COVID-19 and being placed in the unvaccinated unit, were among the one hundred and fifty-one (151) grievances they received and processed. (Docs. 40 ¶17; 41-4 at 2–5.)

In Godfrey's alleged November 5, 2021 grievance (the "November 5th Grievance"), he stated as follows:

> This is discrimination just because I am non-vaccinated the Facility won't allow me to go to church, have contact visits, access to Facility law library & leisure library, access to gym & big yard, water fountain on block/unit, opportunity to work and earn a monthly wage, [a]ccess to bleach to properly clean living area. And why are my cell window(s) [sic] (cell-31) frosted so that I can't see outside . . . this is cruel & unusual punishment.

> The relief I seek is: $1,500.00 per day beginning from 9-21-21 for damages of injury pain [sic] and suffering. $2,500.00 per day beginning from 9-21-21 for punitive damages.
>
> . . .
>
> I sent numerous [r]equest slips to Superintendent McGinley and his response always was, "Get vaccinated and it's [n]o [l]onger [a]n [i]ssue.

(Doc. 41-3 at 2.)[4] Godfrey never received a response to this grievance. (Doc. 41-9 at 29, 31–32); *see also* (Doc. 22 ¶21 (alleging that this grievance "went unanswered for months")).

---

[4] Godfrey attached an alleged copy of the November 5th Grievance to his original complaint. *See* (Doc. 1-2 at 1.) He did not, however, attach it or the other documents attached to the complaint, *see* (Docs. 1-1, 1-3–1-10), to his amended complaint (Doc. 22). When Godfrey filed this amended complaint, it rendered his original complaint a nullity. *See Palakovic v. Wetzel*, 854 F.3d 209, 220 (3d Cir. 2017) ("[I]n general, an amended pleading—like the amended complaint here—supersedes the earlier pleading and renders the original pleading a nullity."); *see also* M.D. Pa. L.R. 15.1(a) (requiring that party seeking leave to amend their complaint to file the amended complaint in a manner "so that it will be complete in itself including exhibits"); (Doc. 21 ¶3 (requiring Godfrey's amended complaint to be, *inter alia*, "complete, in and of itself, *without reference* to any prior filings" (emphasis added)). Nevertheless, since Defendants refer to and attach a copy of this alleged grievance to their moving papers (Doc. 41-3) and asked Godfrey about it during his deposition (Doc. 41-9 at 28–30), the Court considers it in resolving Defendants' motion for summary judgment. *See Blizman v. Travelers Pers. Ins. Co.*, 504 F. Supp. 3d 345, 348 n.5 (M.D. Pa. 2020) (considering exhibits attached to original complaint in "interest of efficiency" where both parties referred to the exhibits despite the filing of an amended complaint (citing *DeFebo v. Andersen Windows, Inc.*, No. 09-cv-2993, 2009 WL 3150390, at *1 n. 1 (E.D. Pa. Sept. 24, 2009))).

Godfrey acknowledges that his grievance does not refer to "anything about Zales or Hilton skipping breakfasts." (Doc. 41-9 at 30.) He also acknowledges that he did not "say Wetzel, Little, McGinley, [and] Gibson" in his grievance; instead, he said "[t]he facility won't allow [him] to go to church, et cetera." (*Id.*) However, Godfrey believes that "[a]ll the details and everything that happened" with Zales and Hilton were included in his amended complaint. (*Id.*); *see also* (Doc. 22 ¶22 (alleging that when DOC staff "choose not to answer [his] grievance in a mannerable [sic] time[, he] had no choice[] and was forced to file" his civil complaint in this case "to redress [his] concerns/[c]onstitutional violations")). According to Godfrey, the November 5th Grievance was "just the beginning" and, once he filed this civil action, he "put all the details in." (*Id.* at 30–31); *see also* (*id.* at 36 ("[O]nce I filed a Grievance [sic] about being mistreated and stuff like that, once I got to th[is] civil suit, that's when I was going to put it all into framework. The Grievance [sic] is just basically, . . . like being punished, being mistreated . . . . That'll cover everything that I'm going to put – that I put in th[is] civil suit.").

### 4.    Unvaccinated Inmates and J-Block

On August 5, 2021, the DOC Central Office sent an email to the State Correctional Institutions ("SCIs") directing them to dedicate a specific housing unit for their unvaccinated inmates by August 9, 2021. (*Id.* ¶¶32–33;

Doc. 41-10 at 2–4.) This email provided that unvaccinated inmates were to receive the same services as vaccinated inmates. (Doc. 40 ¶34); *see also* (Doc. 41-10 at 3 ("Unvaccinated status will not impact an inmate's access to services.")). The DOC Central Office reiterated through an email sent on January 21, 2022, that all programs, services, and treatments were to be provided to the unvaccinated housing units. (Doc. 40 ¶35.) On March 30, 2022, the DOC Central Office directed the SCIs to develop demobilization plans, which included eliminating the unvaccinated units starting on April 4, 2022. (*Id.* ¶36.)

### 5. Godfrey's Deposition Testimony about Conditions in J-Block

During the time Godfrey was in J-Block, there were occasions where he and the other inmates were only permitted out of their cells for anywhere from fifteen (15) to forty-five (45) minutes a day and had to choose whether to use this time to shower or call their families. (Doc. 41-9 at 11–12, 20.) There were also other times where they were allowed to come out of their cells for fifteen (15) minutes three (3) times per day. (*Id.* at 20–21.) Other inmates in general population told Godfrey that they were allowed out of their cells for longer periods. (*Id.* at 21.)

Godfrey testified that "in general, it wasn't really that bad" on J-Block except "for the extra stuff that they were doing." (*Id.* at 12.) The "extra stuff"

included instances where Godfrey would not get his breakfast if he was not standing at his door with his light on when they came to deliver breakfast, such as times when he was sleeping. (*Id.* at 12, 14.) This occurred "[o]ver ten" times. (*Id.* at 14.) When it occurred, Godfrey's breakfast would instead be placed "in the middle of the block," and when Godfrey tried to get it, he would be told he could not have it because he was not at his door "when they was [sic] passing out trays." (*Id.*) The same two (2) correctional officers, Hilton and Zales, who worked the 6:00 a.m. to 2:00 p.m. shift at SCI Coal Twp., were the individuals who occasionally deprived Godfrey of breakfast. (*Id.* at 15, 16.)

Godfrey believed he was being denied meals, which, when it happened, occurred mostly at breakfast, but it occasionally happened at lunch as well. (*Id.* at 12, 13–14.) It did not occur at dinner. (*Id.* at 13.) Godfrey also believed that if correctional officers could "wake you up for count," they could have awakened him so he could get food by banging or kicking on his door. (*Id.*) In general population, no inmate had to stand by their door to get breakfast. (*Id.* at 16–17.)

While Godfrey was in J-Block, he was not permitted to have contact visits with family; however, he was permitted to use the telephone and have video visits. (*Id.* at 18.) For religious services, Godfrey could not attend a live

service, and he did not receive religious literature like he received when he was previously housed in the RHU. (*Id.* at 19.) Godfrey wrote to the prison pastor about the lack of literature, but he never heard back from the pastor. (*Id.* at 20.)

As for access to food, clothing, shelter, and medical care, Godfrey had access to those while in J-Block, even if there were certain restrictions. (*Id.* at 22.) Godfrey could not see out his window because it was "frosted." (*Id.* at 23.) Commissary would come to J-Block and go cell by cell, and Godfrey had books which were sent to him from his family. (*Id.*) Godfrey also had his own television in his cell. (*Id.* at 24.)

## B.    Analysis

### 1.    Section 1983 Official-Capacity Claims

In his complaint, Godfrey asserts Section 1983 official-capacity claims for monetary damages against Defendants.  Defendants move for summary judgment on these claims because (1) they are not "persons" amenable to suit under Section 1983 when sued for monetary damages in their official capacities and (2) the Eleventh Amendment bars these claims. *See* (Doc. 39 at 7). The Court agrees.

Godfrey cannot maintain his Section 1983 official-capacity claims against Defendants because they are not "persons" amenable to suit under

Section 1983. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) ("[N]either a State nor its officials acting in their official capacities are 'persons' under [Section] 1983."). In addition, Godfrey's Section 1983 official-capacity claims are barred by the Eleventh Amendment, which provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. This Amendment

> has been interpreted to render states—and, by extension, state agencies and departments and officials when the state is the real party in interest—generally immune from suit by private parties in federal court. Indeed, it has been recognized for over two hundred years that a state's immunity from suit in federal court is a fundamental principle of our constitutional structure that preserves, as intended by the Framers, the respect and dignity of the states and protects the ability of the states "to govern in accordance with the will of their citizens."

*Pa. Fed'n of Sportsmen's Clubs, Inc. v. Hess*, 297 F.3d 310, 323 (3d Cir. 2002) (quoting *Alden v. Maine*, 527 U.S. 706, 751 (1999)).

Eleventh Amendment immunity extends to all state agencies, departments, and entities "having no existence apart from the state." *Laskaris v. Thornburgh*, 661 F.2d 23, 25 (3d Cir. 1981) (citation omitted). As such, the DOC, as an agency of the Commonwealth of Pennsylvania, is entitled to the Commonwealth's Eleventh Amendment immunity. *See* 71 P.S.

§61(a) ("The executive and administrative work of this Commonwealth shall be performed by the . . . Department of Corrections . . . ."); *Lavia v. Pa., Dep't of Corr.*, 224 F.3d 190, 195 (3d Cir. 2000) (stating that "[b]ecause the Commonwealth of Pennsylvania's Department of Corrections is a part of the executive department of the Commonwealth, it shares in the Commonwealth's Eleventh Amendment immunity"); *see also Downey v. Pa. Dep't of Corr.*, 968 F.3d 299, 310 (3d Cir. 2020) (explaining that "state sovereign immunity prohibit[ed]" plaintiff's Section 1983 claims against the DOC).

In this case, Defendants are state officials for purposes of Section 1983 because they work for the DOC. A suit for monetary damages brought against a state official in their official capacity "is not a suit against that official but rather is a suit against that official's office. As such, it is no different from a suit against the State itself." *Will*, 491 U.S. at 71 (internal citation omitted); *see also Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) ("Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" (quoting *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S 658, 690 n.55 (1978))). Thus, Godfrey's Section 1983 official-capacity claims for monetary damages against Defendants constitute claims against the Commonwealth, which is immune

from such claims under the Eleventh Amendment. *See Will*, 491 U.S. at 66, 70–71.

There are, however, three (3) narrow exceptions to Eleventh Amendment immunity potentially applicable to Godfrey's official-capacity claims. The first two (2) exceptions are (1) if the state waives its immunity or (2) Congress exercised its power under Section 5 of the Fourteenth Amendment to override that immunity. *See Graham*, 473 U.S. at 169 ("[A]bsent waiver by the State or valid congressional override, the Eleventh Amendment bars a damages action against a State in federal court."). Neither of these exceptions apply here because the Commonwealth of Pennsylvania has not waived its Eleventh Amendment immunity. *See* 42 Pa. C.S. §8521(b) ("Nothing contained in this subchapter shall be construed to waive the immunity of the Commonwealth from suit in Federal courts guaranteed by the Eleventh Amendment to the Constitution of the United States."); *Lavia*, 224 F.3d at 195 (explaining that Pennsylvania has not waived its Eleventh Amendment immunity). In addition, Congress did not intend to abrogate a state's Eleventh Amendment immunity by enacting Section 1983. *See Quern v. Jordan*, 440 U.S. 332, 344–45 (1979) (stating that "§1983 does not explicitly and by clear language indicate on its face an intent to sweep away the immunity of the States; nor does it have a history

which focuses directly on the question of state liability and which shows that Congress considered and firmly decided to abrogate the Eleventh Amendment immunity of the States"). As for the third exception, the Eleventh Amendment does not bar a "suit[] against state officers for prospective relief to end an ongoing violation of federal law." *MCI Telecomm. Corp. v. Bell Atl. Pa.*, 271 F.3d 491, 503 (3d Cir. 2001). Here, Godfrey does not request prospective injunctive relief in his amended complaint. Therefore, none of the exceptions to Defendants' Eleventh Amendment immunity applies in this case. Accordingly, Defendants are entitled to summary judgment on Godfrey's Section 1983 official-capacity claims for monetary damages against them.

### 2.   Exhaustion of Administrative Remedies

Defendants move for summary judgment on Godfrey's Section 1983 claims by arguing that he failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA") prior to filing his complaint (or amended complaint) in this case. (Doc. 39 at 8–10.) The Court agrees with Defendants as to all of them except for McGinley.

### a.   Exhaustion Requirement Generally

The PLRA contains an administrative exhaustion requirement, which mandates that "[n]o action shall be brought with respect to prison conditions

under [S]ection 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. §1997e(a). In other words, exhaustion of available administrative remedies is a prerequisite for a prisoner asserting a claim under Section 1983 regarding their prison conditions. *See Rinaldi v. United States*, 904 F.3d 257, 265 (3d Cir. 2018); *see also Ross v. Blake*, 578 U.S. 632, 638 (2016) (reiterating that the PLRA's "language is 'mandatory': An inmate 'shall' bring 'no action' (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies" (quoting *Woodford v. Ngo*, 548 U.S. 81, 85 (2006))); *Jones v. Bock*, 549 U.S. 199, 211 (2007) (stating that "[t]here is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court" (citation omitted) (alteration added)); *Booth v. Churner*, 532 U.S. 731, 733–34 (2001) (stating that the PLRA "now requires a prisoner to exhaust 'such administrative remedies as are available' before suing over prison conditions" (quoting 42 U.S.C. §1997e(a))). "The PLRA requires proper exhaustion, meaning 'complet[ing] the administrative review process in accordance with the applicable procedural rules.'" *Downey*, 968 F.3d at 305 (alteration in original) (quoting *Woodford*, 548 U.S. at 88). "These applicable procedural rules are

supplied by the individual prisons." *Id.* (citations omitted); *see also Spruill v. Gillis*, 372 F.3d 218, 222 (3d Cir. 2004) (stating that "the determination [of] whether a prisoner has 'properly' exhausted a claim . . . is made by evaluating the prisoner's compliance with the prison's administrative regulations governing inmate grievances"); *Jones*, 549 U.S. at 218 (explaining that [t]he level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim"); *Woodford*, 548 U.S. at 90 (indicating that "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules").

A prisoner's failure to follow a prison's procedural rules will result in a procedural default of their claims. *See Spruill*, 372 F.3d at 230–32 (concluding that PLRA's exhaustion requirement includes procedural default component); *see also Drippe v. Tobelinski*, 604 F.3d 778, 781 (3d Cir. 2010) (pointing out that *Spruill* held "that the PLRA includes a procedural default component and the determination whether a prisoner properly exhausted a claim is made by evaluating compliance with the prison's specific grievance procedures"). A procedural default may be excused, however, if the prisoner can show that the administrative remedies were unavailable to them. *See Rinaldi*, 904 F.3d at 266 ("The PLRA requires only 'proper exhaustion,'

meaning exhaustion of those administrative remedies that are 'available.'"
(quoting *Woodford*, 548 U.S. at 93)). "An administrative remedy is
unavailable when it 'operates as a simple dead end[,] . . . is so opaque that
it becomes, practically speaking, incapable of use, or when prison
administrators thwart inmates from taking advantage of a grievance process
through machination, misrepresentation, or intimidation.'" *Downey*, 968 F.3d
at 305 (alterations in original) (quoting *Shifflett v. Korszniak*, 934 F.3d 356,
365 (3d Cir. 2019)).

The failure to exhaust available administrative remedies "is an
affirmative defense under the PLRA." *Jones*, 549 U.S. at 216. As such, "[t]he
burden to plead and prove failure to exhaust as an affirmative defense rests
on the defendant." *Rinaldi*, 904 F.3d at 268 (citing *Ray v. Kertes*, 285 F.3d
287, 295 (3d Cir. 2002)). However, "once the defendant has established that
the inmate failed to resort to administrative remedies, the onus falls on the
inmate to show that such remedies were unavailable to [them]." *See id.*
(citation omitted).

Finally, requiring a prisoner to exhaust available administrative
remedies before filing suit in federal court advances the policy justifications
of the PLRA, *i.e.*, to "return[] control of the inmate grievance process to prison
administrators, encourag[e] the development of an administrative record,

and perhaps settlements, within the inmate grievance process, and reduc[e] the burden on the federal courts by erecting barriers to frivolous prisoner lawsuits." *Downey*, 968 F.3d at 305 (citation and internal quotation marks omitted); *Jones*, 549 U.S. at 204 (explaining that exhaustion requirement "allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court"). It also "reduces any incentive that prison officials otherwise might have to use threats to prevent inmates from exhausting their administrative remedies and thereby safeguards the benefits of the administrative review process for everyone." *Rinaldi*, 904 F.3d at 268 (citation and internal quotation marks omitted).

### b.   Analysis

Based on the Court's review of the summary judgment record, there is undoubtedly an issue as to whether Godfrey filed the November 5th Grievance. The only evidence in the record showing that Godfrey submitted this grievance is his alleged possession of a copy of the grievance, which lacks a tracking number, and his deposition testimony. Godfrey testified during his deposition that he placed this grievance in the lock box in J-Block, as he was required to do, and never received a response to it.

On the other hand, Defendants submit evidence that if Godfrey submitted the November 5th Grievance, Toms would have obtained it from the lock box and sent it to the Superintendent's Office where Kelley would have processed it. If Kelley received Godfrey's grievance, it would have been assigned a tracking number and Godfrey would have received a copy of his grievance with that tracking number. The November 5th Grievance did not receive a tracking number, and it is not listed amongst the grievances submitted by J-Block inmates in SCI Coal Twp.'s grievance tracking system. As such, Defendants posit that the grievance was never submitted for review. *See* (Doc. 39 at 9).

While the evidence in the record leans in Defendants' favor,[5] the Court cannot weigh evidence when considering a motion for summary judgment.

---

[5] Godfrey's testimony is further weakened by the fact that there is no evidence in the record indicating that he ever inquired as to the status of the November 5th Grievance. Godfrey appeared to testify during his deposition that he wrote McGinley "about the Grievance" and purportedly had a copy of whatever he wrote. (Doc. 41-9 at 29–30). However, it does not appear from the deposition transcript that Godfrey ever provided a copy of whatever he purportedly wrote to McGinley to defense counsel, and there is nothing in the record showing that he ever asked anyone, including McGinley, about this grievance. Moreover, the Court notes when attaching a copy of the November 5th Grievance to his original complaint, Godfrey also attached copies of Inmate's Request to Staff Member forms that are addressed to McGinley. *See* (Docs. 1-3; 1-10.) These forms do not state anything about the November 5th Grievance. (*Id.*) "[T]his Court is not required to accept unsupported, self-serving testimony as evidence sufficient to create a jury

*(footnote continued on next page)*

Instead, the Court is limited to determining whether there is a genuine dispute as to any material fact. *See* Fed. R. Civ. P. 56(c); *Celotex Corp.*, 477 U.S. at 322–23. As such, there is a genuine dispute as to whether Godfrey submitted the November 5th Grievance.

In addition, presuming that Godfrey placed the November 5th Grievance in the lock box, there is a genuine dispute of material fact about whether SCI Coal Twp.'s grievance process was unavailable to him. Defendants do not argue that Godfrey failed to follow proper procedure in submitting his grievance. Instead, their argument is based on the lack of a record of Godfrey's grievance in their grievance system. Because an administrative remedy may be unavailable to an inmate if a grievance is mishandled, the Court cannot grant summary judgment to Defendants on their argument that Godfrey failed to exhaust his administrative remedies due to failing to submit a grievance. *See Rivera v. Knapp*, No. 22-cv-673, 2025 WL 43549, at *3 (M.D. Pa. Jan. 7, 2025) ("[A] remedy may be unavailable if the process is thwarted because the grievances are mishandled or not properly processed by the prison staff." (citations omitted)); *see also Dole v. Chandler*, 438 F.3d 804, 811 (7th Cir. 2006)

---

question." *Rochester v. Warden of SCI Benner*, No. 17-cv-1220, 2018 WL 3536730, at *6 (M.D. Pa. July 23, 2018) (citation and internal quotation marks omitted).

("Because Dole properly followed procedure and prison officials were responsible for the mishandling of his grievance, it cannot be said that Dole failed to exhaust his remedies.").[6]

Even though the Court cannot grant Defendants' motion based on Godfrey's alleged failure to file a grievance pertaining to some of his allegations in his amended complaint, it does not result in the overall denial of their motion for three (3) reasons. First, to the extent that the administrative process was unavailable to Godfrey as to the November 5th Grievance, he still failed to state information in that grievance that would have placed prison officials on notice that he was claiming a violation of his due process rights or that there were issues with him receiving his meals. Second, Godfrey does not provide information in the grievance that would have placed prison officials on notice that Little, Wetzel, Gibson, Luscavage, Hilton, and Zales were involved in the events described in the grievance. Third, Godfrey's constitutional claims are meritless. The Court will address each of these reasons in turn.

---

[6] The Court's conclusion here does not reflect a finding that anyone at SCI Coal Twp. mishandled the November 5th Grievance.

### (1)    Failure to Provide Sufficient Notice of Some of Godfrey's Section 1983 Claims

Presuming that a procedural default pertaining to Godfrey's November 5th Grievance is excused by the administrative process being unavailable to him, it only excuses exhaustion as to claims contained with that grievance. In other words, any excusal does not automatically warrant a conclusion that all of Godfrey's causes of action in this case are exhausted. Instead, only those claims fairly encompassed within the November 5th Grievance would be deemed exhausted.

PLRA exhaustion "requires 'inmates [to] provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures.'" *Mack v. Warden Loretto FCI*, 839 F.3d 286, 296 (3d Cir. 2016) (alteration in original) (quoting *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004)). "Restated slightly, an inmate's grievance must include facts sufficient to place prison officials on notice of the claim or claims to be investigated." *Jackson v. O'Brien*, No. 18-cv-32, 2021 WL 5087922, at *6 (W.D. Pa. Nov. 2, 2021); *see also* (Doc. No. 41-1 at 10 ("The inmate shall specifically state any claims he/she wishes to make concerning violations of Department directives, regulations, court orders, or other law.")).

In this case, Godfrey complained in his November 5th Grievance that he is being discriminated against because of his unvaccinated status insofar

as he is not permitted to: (1) go to church; (2) have contact visits; (3) access the law library and "leisure library"; (4) access the gym, "[b]ig yard," and water fountain on the block; (5) have the opportunity to "work and earn a monthly wage"; and (6) access "bleach to properly clean [the] living area." (Doc. 1-2 at 1.) He also complained about his "frosted" cell windows preventing him from seeing through the windows. (*Id.*)

Although the Court recognizes that it is unnecessary for a prisoner-plaintiff to use the phrase "due process" in a grievance to properly raise and exhaust the claim, *see, e.g.*, *Jackson*, 2021 WL 5087922, at *6 (explaining that prisoner-plaintiffs did not need to "use the word 'retaliation' in [their] grievance to properly raise the claim"), there is no explicit reference to "due process" in the November 5th Grievance. Moreover, the information contained in the November 5th Grievance would not place prison officials on notice that the substance of the grievance relates to a violation of due process. *See id.* (pointing out that prisoner-plaintiffs "must include enough information to put prison officials on notice that the substance of the issue is retaliation"). In other words, it does not include any facts that would have placed the reviewing officials at SCI Coal Twp. on notice that Godfrey believed that Defendants (or any other prison official) violated his due process rights by confining him in the alleged conditions.

Godfrey's sole complaint is about the conditions of his confinement due to his unvaccinated status. There are no complaints about the policies or procedures by which he was placed in these conditions of confinement, his inability or inability to challenge the conditions of his confinement, or anything else that would remotely suggest he was raising a due process concern and provide prison officials with the opportunity to investigate and address the issue. Accordingly, Godfrey failed to exhaust his procedural due process claim against Defendants. *See Vo v. Wetzel*, No. 22-1210, 2022 WL 1467978, at *2 (3d Cir. May 10, 2022) (unpublished) (concluding that the district court "properly found that [the prisoner-plaintiff] failed to exhaust her equal protection claim for the confiscation of her art portfolio" because even though the plaintiff's "grievance informed prison officials that her property had been confiscated in contravention of the prison's policies, . . . it did not alert them to any issue of disparate treatment"). *Bradley v. Kessnich*, No. 20-cv-562, 2022 WL 1063815, at *3 (W.D. Wisc. Apr. 8, 2022) (concluding that prisoner-plaintiff failed to exhaust due process claim against prison official because plaintiff did not include the claim in her grievance); *Sperry v. Robert*, No. 18-cv-3120, 2021 WL 3668387, at *8 & n.13 (D. Kan. July 13, 2021) (recognizing that a prisoner-plaintiff need not "detail each legal theory [in their grievance, it] must be particular enough to provide administrators with

a fair opportunity under the circumstances to address the problem," and concluding that although plaintiff's grievance "satisfie[d] this requirement for his Fifth Amendment Takings Clause claim," it did not for "the litany of other claims he now asserts," which included a due process claim), *aff'd*, No. 21-3151, 2022 WL 2798994 (10th Cir. July 18, 2022) (unpublished); *Wright v. Peters*, No. 13-cv-3024, 2015 WL 541328, at *4 (S.D. Cal. Feb. 9, 2015) (determining that defendants "met their burden to show that there is no evidence in the record that Plaintiff filed a grievance related to his due process claims" because his "grievance d[id] not reference his due process claims in which he [challenges] his placement in ad-seg").

Additionally, while Godfrey complains about several conditions of his confinement in the November 5th Grievance, he does not allege that he was denied meals at all. In fact, Godfrey admitted during his deposition that the grievance did not indicate that Hilton or Zales denied him meals. *See* (Doc. 41-9 at 11 ("Q. Would you agree with me that [the November 5th Grievance] doesn't say anything about Zales or Hilton skipping breakfasts? A. . . . Yeah, I can agree to that." (emphasis omitted))). Instead, Godfrey appears to incorrectly believe that he exhausted the claim because it was included in his amended complaint:

> Q. How come you didn't file a [g]rievance about the breakfast thing?

> A. Because once I filed a [g]rievance about being mistreated and stuff like that, once I got to the civil suit, that's when I was going to put it all into framework. The [g]rievance is just basically, you know what I mean, like being punished, being mistreated, you know what I mean? That'll cover everything that I'm going to put – that I put in that civil suit.

(*Id.* at 12 (emphasis omitted)). Overall, considering that Godfrey did not include information about any missing meals in the November 5th Grievance, and admitted as such, he failed to exhaust any Section 1983 claim pertaining to Hilton or Zales allegedly depriving him of meals. *See Quinn v. Palakovich*, 204 F. App'x 116, 118 (3d Cir. 2006) (unpublished) (determining that prisoner-plaintiff's failure-to-protect claim against correctional officials was not exhausted where the plaintiff's grievance included "brief language about [his] slip-and-fall in the kitchen," which "serves only to describe the location of his injury to the personnel receiving his grievance about his medical treatment"); *Pew v. Little*, No. 22-cv-1488, 2025 WL 2471780, at *4 (E.D. Pa. Aug. 27, 2025) ("While Pew's grievance alerted prison officials to his primary concern—that he had been denied an electric razor—[it] makes no reference to discrimination vis-à-vis other inmates."); *Simmons v. Gilmore*, No. 17-cv-996, 2021 WL 1215773, at *11 (W.D. Pa. Mar. 31, 2021) (granting summary judgment in favor of defendant prison officials on prisoner-plaintiff's First Amendment retaliation claim for failure to exhaust where plaintiff's grievance

"did not reasonably identify the factual basis for, or otherwise put prison officials on notice of, a First Amendment retaliation claim").

### (2)   Failure to Name Certain Defendants

Along with the failure to provide prison officials with notice of his Section 1983 due process claim and any Section 1983 claim related to Hilton or Zales denying him meals, Godfrey failed to place them on notice that Little, Wetzel, Gibson, Luscavage, Hilton, and Zales were involved in the events referenced in the November 5th Grievance. As such, Godfrey failed to exhaust any Section 1983 claims asserted against these Defendants in his amended complaint.

"[T]he PLRA itself does not have a 'name all defendants' requirement." *Byrd v. Shannon*, 715 F.3d 117, 127 (3d Cir. 2013) (quoting *Jones*, 549 U.S. at 217). Nonetheless, "prisoners are required to complete the administrative review process in accordance with rules that are defined by the prison grievance process," *id.* (citing *Jones*, 549 U.S. at 218), and DC-ADM 804 requires an inmate's grievance to include "a statement of the facts relevant to the claim" and to "identify individuals directly involved in the event(s)." (Doc. 41-1 at 10); *see also* (Docs. 40 ¶11; 41-7 ¶8). Here, although the November 5th Grievance mentions McGinley as one of the individuals Godfrey spoke to about his concerns relating to his conditions of confinement

on J-Block, he does not identify Little, Wetzel, Gibson, Luscavage, Hilton, or Zales by name. (Doc. 41-3 at 2.)

Despite this failure to identify Little, Wetzel, Gibson, Luscavage, Hilton, or Zales by name, the Court recognizes that "the primary purpose of a grievance is to alert prison officials to a problem, not to provide personal notice to a particular official that he may be sued." *Williams v. Beard*, 482 F.3d 637, 638, 640 (3d Cir. 2007) (quoting *Jones*, 549 U.S. at 219). Thus, courts have found a plaintiff fully exhausted their claims even though they did not include a defendant's name in their grievance where the plaintiff provided the title of the unnamed prison official or a functional description of the prison official's job. *See id.* (concluding that plaintiff's description of the "'2-10' staff of the cell block" to be sufficient identification of defendants for exhaustion purposes); *Trainor v. Wellpath*, No. 20-cv-225, 2023 WL 2603196, at *15 (W.D. Pa. Mar. 22, 2023) ("[C]ourts in the Third Circuit have found that inmates may adequately identify individuals in a grievance without using their names."), *aff'd*, No. 23-1771, 2024 WL 1427635 (3d Cir. Apr. 3, 2024) (unpublished). Such a finding is also dependent on the sufficiency of the other facts included in the grievance. *See Travillion v. Wetzel*, 765 F. App'x 785, 789 (3d Cir. 2019) (unpublished) (pointing out that plaintiff "specified the date, location, and relevant facts related to his claim, as is . . .

required by DC-ADM 804 §1(A)(11)" and concluding that if district court found that plaintiff's identification of certain defendants as "RHU Staff and Unit Management" was sufficient for exhaustion purposes, his identification of other defendants as "SCI-Rockview staff and/or administration" was also sufficient to comply with the identification requirement of DC-ADM 804 §1(A)(11)); *Perez v. Reno*, No. 22-cv-1021, 2023 WL 6051258, at *2 (M.D. Pa. Sept. 15, 2023) (determining that plaintiff's reference to "the 2-10 shift officer" was sufficient identification where grievance also provided specific information about date, time, and actions of assault by other inmate); *see also Johnson v. Johnson*, 385 F.3d 503, 523 (5th Cir. 2004) (explaining that "a grievance can sufficiently identify a person even if it does not provide an actual name; functional descriptions and the like—e.g., a reference to 'the guards in the shower room' on a certain date—would suffice" (citation omitted)).

In this case, Godfrey indicates that "the Facility" was preventing him from certain things based on his unvaccinated status. (Doc. 1-2 at 1.) Godfrey's identification of "the Facility" as causing his complained-of issues is insufficient to identify any Defendants for purposes of exhaustion. There are no job descriptions in his November 5th Grievance, and Godfrey does not identify any times or dates other than when he indicates that he seeks

damages starting from September 21, 2021. At bottom, the information in the November 5th Grievance is wholly insufficient to alert prison officials that Godfrey was raising concerns about the conduct of Little, Wetzel, Gibson, Luscavage, Hilton, and Zales. Accordingly, Godfrey's Section 1983 claims against Little, Wetzel, Gibson, Luscavage, Hilton, and Zales are procedurally defaulted due to his failure to specifically name or otherwise provide sufficient information to identify them in the November 5th Grievance. *See Spruill*, 372 F.3d at 234 (explaining that plaintiff's failure to name defendant in initial grievance, despite DC-ADM 804 requiring prisoners to identify "facts relevant to the claim," meant any claim against that defendant was procedurally defaulted unless otherwise excused); *Byrd*, 715 F.3d at 127 (concluding prisoner failed to exhaust by not naming defendant in grievance as required by DC-ADM 804).

### (3)    Section 1983 Claims Against McGinley

As for Godfrey's Section 1983 claims against McGinley, Defendants incorrectly assert that his name is not included in the November 5th Grievance. *See* (Doc. 39 ("The grievance that Plaintiff claims he filed related to this lawsuit does not identify Defendants Wetzel, Little, **Mcginley** [sic], Gibson, Luscavage, Hilton, or Zales." (emphasis added)). To the contrary, Godfrey states in the grievance that he sent "numerous [r]equest slips to . .

- 48 -

. McGinley," and he responded by telling Godfrey that it would no longer be an issue if he got vaccinated. (Doc. 1-2 at 1.)

Since Defendants argue that McGinley was not named in the November 5th Grievance, they do not address whether his inclusion would have placed prison officials on notice that he was part of the problem identified in the grievance. *See* (Doc. 39 at 8–10). Admittedly, it is unclear from the grievance that Godfrey claimed that McGinley was responsible for his conditions of confinement. Nevertheless, it is at least arguable that Godfrey's reference to McGinley in his grievance would have placed prison officials on notice that he was involved in the events described in that grievance. For instance, Godfrey asserts that he notified McGinley of the conditions of his confinement, and McGinley failed to act to correct those conditions. Therefore, for purposes of this discussion, the Court will presume that Godfrey exhausted his Section 1983 Eighth Amendment claims against McGinley.[7]  *See Gibson v. Wetzel*, No. 20-cv-1419, 2022 WL 17340386, at *8 (W.D. Pa. Nov. 30, 2022) ("Although the Court has found that there exists an issue of material fact with respect to the preliminary issue of exhaustion,

---

[7] As discussed below, Godfrey's failure-to-intervene claim might be duplicative of his conditions-of-confinement claim.

the Court may proceed to analyze the merits in this case." (citing *Kanu v. Lindsey*, 739 F. App'x 111, 114–16, nn.3, 7 (3d Cir. 2018) (unpublished)).

### 3. Merits of Godfrey's Section 1983 Eighth Amendment Claims

Even if Godfrey's Section 1983 Eighth Amendment claims against McGinley (or any other Defendant) are excused, they lack merit. As such, McGinley is entitled to summary judgment on Godfrey's Eighth Amendment claims.

### a. Eighth Amendment Conditions-of-Confinement

"The Eighth Amendment guarantees the right to be free from 'cruel and unusual punishments' while in custody." *Ricks v. Shover*, 891 F.3d 468, 473 (3d Cir. 2018) (citing *Whitley v. Albers*, 475 U.S. 312, 318 (1986)). "A properly stated Eighth Amendment claim must [include] a subjective and objective element." *Id.* (citing *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)). The subjective element requires evidence showing that the "defendant official act[] with a 'sufficiently culpable state of mind,'" *id.* (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)), while the objective element requires the plaintiff to demonstrate that the defendant official's conduct was "objectively 'harmful enough,' or 'sufficiently serious' to violate the Constitution." *Id.* (quoting *Wilson*, 501 U.S. at 298, 303).

When advancing an Eighth Amendment conditions-of-confinement claim, the plaintiff must show that: (1) they suffered a "sufficiently serious" deprivation; and (2) the prison official defendant had a sufficiently culpable state of mind. *Clark v. Coupe*, 55 F.4th 167, 179 (3d Cir. 2022) (quoting *Thomas v. Tice*, 948 F.3d 133, 138 (3d Cir. 2020)). The first element is an objective standard requiring evidence demonstrating that the plaintiff was denied "the minimal civilized measures of life's necessities." *Id.* (quoting *Wilson*, 501 U.S. at 299). Only "extreme deprivations" are sufficient to make out a conditions of confinement claim. *Hudson*, 503 U.S. at 8–9. Thus, it is insufficient for a plaintiff to show that they were merely uncomfortable. *See id.* Rather, the plaintiff must demonstrate that the conditions of their confinement posed a "substantial risk of serious harm" to their health or safety. *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

A plaintiff must prove that the deprivation is sufficiently serious when viewed within the context of "contemporary standards of decency." *Helling v. McKinney*, 509 U.S. 25, 36 (1993). "Although a combination of confinement conditions—considered alone constitutionally insufficient—may present an Eighth Amendment violation, they nevertheless must cumulatively produce 'the deprivation of a single, identifiable human need such as food, warmth, or exercise.'" *Young v. Ferguson*, No. 18-cv-879, 2020 WL 1505683, at *6–

7 (M.D. Pa. Mar. 30, 2020) (quoting *Wilson*, 501 U.S. at 304), *aff'd*, 830 F. App'x 375 (3d Cir. 2020) (unpublished)); *see also Griffin*, 112 F.3d at 709 (explaining that basic human needs include "food, clothing, shelter, sanitation, medical care and personal safety").

As explained above, the second element is subjective and requires the plaintiff to prove that the defendant "kn[e]w of and disregard[ed] an excessive risk to [the plaintiff's] health or safety." *Farmer*, 511 U.S. at 837. Thus, the defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." *Id.*; *see also Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2001) ("The knowledge element of deliberate indifference is subjective, . . . meaning that the official must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have been aware." (citing *Farmer*, 511 U.S. at 837–38)).

Here, Defendants contend that they are entitled to summary judgment on Godfrey's conditions-of-confinement claim because he fails to show that he was deprived of the minimal civilized nature of life's necessities. (Doc. 39 at 16–17.) The Court agrees.

Starting with the objective element of Godfrey's conditions-of-confinement claim, the only conditions of confinement he identifies in his

deposition are: (1) he was only permitted out of his cells for anywhere from fifteen (15) to forty-five (45) minutes a day and had to choose whether to use this time to shower or call their families, *see* (Doc. 41-9 at 11–12, 20); (2) on various occasions, Godfrey did not get his breakfast or lunch because he was not standing at his door with his light on when prison officials delivered his meal, *see* (*id.* at 12, 14); (3) he was not permitted to have contact visits with family, *see* (*id.* at 18); (4) he could not attend live religious services and did not receive religious literature like he received when he was previously confined in the RHU, *see* (*id.* at 19); and (5) he could not see out of his cell window because it was "frosted," *see* (*id.* at 23). These conditions, either alone or in conjunction, are insufficient to establish a triable issue of fact on the objective element of an Eighth Amendment conditions-of-confinement claim.

Concerning his inability to attend religious services, Godfrey identifies no evidence that he could not otherwise practice his religion during the period of his challenged confinement, and he does not show that this restriction negatively affected his well-being or, more importantly, deprived him of a basic human need. *See, e.g.*, *Allen v. Passaic County Jail*, No. 09-cv-408, 2009 WL 4591206, at *9 (E.D. Pa. Dec. 4, 2009) (determining that prisoner-plaintiff's allegations that he lacked hot water, ate cold food, and was unable

to make collect calls and attend religious services did not constitute an Eighth Amendment violation); *Hosannah v. Nassau Cnty.*, No. 16-cv-1045, 2022 WL 889028, at *5 (E.D.N.Y. Mar. 25, 2022) ("Although it is deplorable that plaintiff was unable to attend his wife's funeral and oftentimes could not attend religious service, it cannot be said these restrictions threatened his well-being or deprived plaintiff of his basic human needs." (citation and internal quotation marks omitted)). As for the alleged limited periods of approximately fifteen (15) minutes to forty-five minutes Godfrey was permitted out of his cell each day, this does not rise to the level of a constitutional violation. *See Gattis v. Phelps*, 344 F. App'x 801, 805 (3d Cir. 2009) (unpublished) (concluding that prisoner's claim that "his exercise was limited to three days per week and that he was not guaranteed outdoor exercise at all times—was insufficiently serious to implicate the Eighth Amendment"); *Christian v. Garman*, No. 20-cv-1842, 2021 WL 1017251, at *1, 7 (M.D. Pa. Mar. 17, 2021) (concluding that prisoner's claim that SCI Rockview's reduction of prisoners' access to the exercise yard to "once every other day, and . . . to groups of no more than ten (10) inmates at a time" in response to the COVID-19 pandemic, along with no factual allegations that the exercise limitations impacted the prisoner's health, did not implicate the Eighth Amendment); *see also Wishon v. Gammon*, 978 F.2d 446, 449 (8th

Cir. 1992) (determining that forty-five (45) minutes of out-of-cell recreation time per week is constitutional).

Godfrey's inability to have contact visits with his family also does not violate the Eighth Amendment. *See Zamarron v. Madrid*, No. 21-cv-919, 2025 WL 1309353, at *12 (D.N.M. May 6, 2025) ("Removing visitation privileges violates the Eighth Amendment only if the removal is arbitrary or lasts for several years." (citations omitted)), *report and recommendation adopted*, 2025 WL 1755565 (D.N.M. June 25, 2025); *Simmons v. Wolff*, 594 F. Supp. 2d 6, 9 (D.D.C. 2009) ("Deprivations such as infrequent or no visits from family . . . simply do not meet the threshold of 'extreme deprivations' required to state an Eighth Amendment claim regarding conditions of prison confinement."); *see also Overton v. Bazzetta*, 539 U.S. 126, 136–37 (2003) (concluding that state prison's two-year restriction on visitation for inmates with two substance-abuse violations did not violate the Eighth Amendment because it was "not a dramatic departure from accepted standards for conditions of confinement," did not "create inhumane prison conditions, deprive inmates of basic necessities, or fail to protect their health or safety," or "involve the infliction of pain or injury, or deliberate indifference to the risk that it might occur"). In addition, although Godfrey testified that he could not have contact visits with his family while on J-Block, he acknowledged that he

was permitted to use the telephone and have video visits with them. (Doc. 41-9 at 18.)

Even when viewed together, Godfrey's challenged conditions of confinement do not reach the level of an Eighth Amendment violation because they do not amount to a deprivation of life's necessities. Godfrey does not complain that he was housed in a cell in deplorable conditions or that he did not have sufficient food and clothing. While Godfrey asserts that he missed certain meals, particularly breakfast, during the day, he was never deprived of dinner, and he did not testify that he regularly missed breakfast or lunch. *See, e.g.*, (*id.* at 6–7 (testifying that he only "occasionally" missed lunch and missed breakfast "[o]ver ten" times)). Godfrey also admits that, *inter alia*: (1) he generally had access to food, clothing, shelter, and medical care; (2) his family would send him books to read; (3) he had his own television in his cell; and (4) commissary would come to his cell when he was in J-Block. (*Id.* at 22–24.) He also admits that his time in J-Block, "in general, . . . wasn't really that bad." (*Id.* at 12.) Overall, a reasonable juror considering the record evidence could not conclude that Godfrey was deprived of the "minimal civilized measure of life's necessities" while confined in J-Block. *See Farmer*, 511 U.S. at 834.

As for the second element of Godfrey's Eighth Amendment claim, there is no evidence in the record showing that McGinley or any Defendant knew of the risks posed by the conditions of his confinement. Godfrey's conclusory statements and allegations that Defendants knew about these risks is insufficient at this stage. Nevertheless, even if the Court presumes that McGinley generally knew about risks associated with the restrictions imposed on Godfrey's confinement, nothing in the record shows that he knew that Godfrey was experiencing issues caused by those risks or knew facts from which they could infer that Godfrey should not be incarcerated under those conditions. In fact, in Godfrey's Inmate Request to Staff forms directed to McGinley, which he attached to his original complaint, Godfrey never mentions that he was suffering from any issues; instead, he appears to complain that he was still at risk of catching COVID-19. *See* (Docs. 1-3 at 1; 1-10 at 1). In the end, no reasonable juror could find that McGinley or any other Defendant was deliberately indifferent where the record does not indicate that they knew Godfrey was experiencing any risks associated with the restrictions on his confinement. There is also no evidence in the record showing that McGinley or any Defendant were the individuals who placed him in the custody he complains of or, even if they did, that they lacked a legitimate penological purpose when placing and then keeping an

unvaccinated Godfrey in conditions allegedly more restrictive than general population. Accordingly, McGinley is entitled to summary judgment on Godfrey's Eighth Amendment conditions-of-confinement claim.

### b.    Eighth Amendment Failure to Intervene

Defendants move for summary judgment on Godfrey's Eighth Amendment failure-to-protect claim because Godfrey has not shown that his constitutional rights were violated. (Doc. 39 at 17.) Thus, they had no need to intervene to protect him. (*Id.*) Once again, the Court agrees.

"To prevail on a failure to intervene claim, a plaintiff must show: (1) that the defendant failed or refused to intervene when a constitutional violation took place in his or her presence or with his or her knowledge; and (2) there was a realistic and reasonable opportunity to intervene." *Balliet v. Luzerne Cnty.*, No. 22-cv-2032, 2024 WL 2275252, at *8 (M.D. Pa. May 20, 2024) (citations and internal quotation marks omitted). "[T]he duration of the incident is key to determining whether there was a reasonable opportunity [to intervene]." *El v. City of Pittsburgh*, 975 F.3d 327, 335 (3d Cir. 2020) (citing *Ricks*, 891 F.3d at 479). If "an incident is momentary, its 'brevity' may 'defeat[] [a] . . . failure to protect claim." *Id.* (alterations in original) (quoting *Ricks*, 891 F.3d at 479).

In this case, it is unclear from the amended complaint whether Godfrey alleges that McGinley or any of the Defendants were responsible for placing him in his challenged conditions of confinement. To the extent that this is Godfrey's allegation, it is duplicative of his conditions-of-confinement claim. *See Davis v. Clark*, No. 1:21-CV-188, 2022 WL 4287668, at *6 (W.D. Pa. Aug. 10, 2022) (dismissing as duplicative prisoner-plaintiff's claim that "Defendants failed to intervene to prevent his continued confinement in unconstitutional conditions"), *report and recommendation adopted*, 2022 WL 3654927 (W.D. Pa. Aug. 25, 2022); *Janowski v. City of N. Wildwood*, 259 F. Supp. 3d 113, 132 (D.N.J. 2017) (dismissing counts as duplicative where they were premised on the same allegations and underlying facts as other claims). To the extent that Godfrey alleges that McGinley and the other Defendants failed to intervene to ameliorate his conditions of confinement, the Court has already determined that those conditions did not violate the Constitution. Accordingly, McGinley did not have a duty to intervene, and he is entitled to summary judgment on Godfrey's failure-to-intervene claim.

### c.    Procedural Due Process

Although the Court has already concluded that Godfrey failed to exhaust his procedural due process claim, McGinley and the other Defendants would be entitled to summary judgment on this claim because it

is meritless. The Fourteenth Amendment of the United States Constitution provides in pertinent part that: "No State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Cons. amend. XIV, §1. "The core concept of due process is protection against arbitrary government action [and, a]s that concept has developed, it has come to have both substantive and procedural components." *Evans v. Sec'y Pa. Dep't of Corr.*, 645 F.3d 650, 658 (3d Cir. 2011) (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998)). The substantive component "limits what government may do regardless of the fairness of procedures that it employs," *see Boyanowski v. Cap. Area Intermediate Unit*, 215 F.3d 396, 399 (3d Cir. 2000), whereas the procedural component "governs the manner in which the government may infringe upon an individual's life, liberty, or property." *Evans*, 645 F.3d at 662.[8]

Godfrey, as with all prisoners, is "not completely deprived of the protections of the Due Process Clause simply because [he is a] prisoner[]."

---

[8] The Court does not construe Godfrey's amended complaint as containing a substantive due process claim. Even if it did, it would fail because of the "more-specific-provision rule," which provides that "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 260 (3d Cir. 2010) (quoting *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997)).

*Id.*; *see also Sandin v. Conner*, 515 U.S. 472, 485 (1995) (explaining that although prisoners "do not shed all constitutional rights at the prison gate, lawful incarceration 'brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system'" (internal citation omitted) (quoting *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 125 (1977))). Thus, "[p]rocedural protections must be afforded to [prisoners] before they are stripped of the rights they still retain while incarcerated." *Evans*, 645 F.3d at 662–63 (citation omitted).

There are two (2) scenarios in which a prisoner holds a liberty interest triggering due process protections:

> when "state statutes and regulations create a liberty interest in freedom from restraint that imposes an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," and (2) when "severe changes in conditions of confinement amount to a grievous loss that should not be imposed without the opportunity for notice and an adequate hearing."

*Evans*, 645 F.3d at 663 (quoting *Renchenski v. Williams*, 622 F.3d 315, 325 (3d Cir. 2010)). These two (2) scenarios are characterized as a "'so-called state-created liberty interest'" and a "'so-called independent due process liberty interest,'" respectively. *Id.* (quoting *Renchenski*, 622 F.3d at 325).

With respect to independent due process liberty interests, "[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon [them] and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight." *Montanye v. Haymes*, 427 U.S. 236, 242 (1976). Thus, an independent due process liberty interest arises only "when severe changes in conditions of confinement amount to a grievous loss that should not be imposed without the opportunity for notice and an adequate hearing." *Renchenski*, 622 F.3d at 325. Examples of such severe changes in conditions of confinement include, *inter alia*, "forced administration of antipsychotic medication, *Washington v. Harper*, 494 U.S. 210, 221–22 (1990), or involuntary transfer to a mental hospital, *Vitek v. Jones*, 445 U.S. 480, 492 (1980), or, for a prisoner not convicted of a sex offense, forced participation in sex-offender therapy, *Renchenski*, 622 F.3d at 326." *Evans*, 645 F.3d at 665 (first two citations altered from original).

State-created liberty interests are "generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, . . . nonetheless imposes atypical and significant hardship on the

inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484 (internal citations omitted); *Wilkinson v. Austin*, 545 U.S. 209, 223 (2005) (stating that, "[a]fter *Sandin*, it is clear that the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves 'in relation to the ordinary incidents of prison life'" (quoting *Sandin*, 515 U.S. at 484)); *Williams v. Sec'y Pa. Dep't of Corr.*, 848 F.3d 549, 559 (3d Cir. 2017) (explaining that, "in the conditions of confinement context," the liberty interest must be "substantial": "the right alleged must confer freedom from restraint which imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" (internal quotations omitted)). A two (2)-factor inquiry informs whether prison conditions impose "atypical and significant hardship": "(1) the duration of the challenged conditions; and (2) whether the conditions overall imposed a significant hardship in relation to the ordinary incidents of prison life." *Williams*, 848 F.3d at 560 (citing *Shoats v. Horn*, 213 F.3d 140, 144 (3d Cir. 2000)). Additionally, when determining whether a state-created liberty interest exists, courts are not to "compare the prisoner's own life before and after the deprivation." *Powell v. Weiss*, 757 F.3d 338, 344 (3d Cir. 2014). Instead, "[t]he baseline for determining what is

atypical and significant—the ordinary incidents of prison life—is ascertained by what a sentenced inmate may reasonably expect to encounter as a result of his or her conviction in accordance with due process of law." *Id.* (citations and internal quotation marks omitted).

Here, Godfrey bases his procedural due process claim on a state-created liberty interest. *See* (Doc. 22 at 7–8).[9] However, no such liberty interest is implicated in this case. *See Williams v. Sorber*, No. 24-2046, 2025 WL 1419716, at *3 (3d Cir. May 16, 2025) (concluding that prisoner-plaintiff "failed to state a procedural due process claim based on his transfer to the quarantine unit" at SCI Phoenix during the COVID-19 pandemic, where the plaintiff remained from August 2021 until April 2022, because "[i]t is well settled that a prison does not have a protected right to be placed in the cell or unit of [their] choice" and "months-long stays in restrictive confinement did not implicate a liberty interest" (citations omitted)). Presuming that Godfrey's challenged confinement at SCI Coal Twp. is a form of restrictive confinement,

---

[9] Even if Godfrey attempted to assert that he had an independent liberty interest at stake, the Court would reach the same result. *See Spellman v. Doe*, No. 22-cv-69, 2023 WL 2666694, at *5–6 (M.D. Pa. Mar. 28, 2023) (dismissing prisoner-plaintiff's procedural due process claim based on his placement in a housing unit with other unvaccinated prisoners during COVID-19 pandemic because the plaintiff "does not have an independent due process liberty interest in placement in any particular prison during the term of imprisonment imposed" (citations omitted)).

courts have found similar and even greater deprivations insufficient to establish an atypical and significant hardship on an inmate. *See, e.g.*, *Smith v. Mensinger*, 293 F.3d 641, 654 (3d Cir. 2002) (holding that placement in disciplinary confinement for seven (7) months "does not, on its own, violate a protected liberty interest as defined in Sandin"); *Griffin*, 112 F.3d at 708 (determining that placement in administrative custody without a due process hearing for fifteen (15) months was not an atypical and significant hardship); *Dunbar v. Barone*, 487 F. App'x 721, 725 (3d. Cir. 2012) (unpublished) (concluding that plaintiff failed to establish a protected liberty interest after spending approximately eighteen (18) months in disciplinary custody); *Lawrence v. Talutto*, No. 24-cv-502, 2024 WL 2328215, at *4 (M.D. Pa. May 22, 2024) ("Lawrence has not identified a protected liberty or property interest with respect to being housed in administrative segregation for 12 months."); *Dougan v. PrimeCare Med., Inc.*, No. 22-cv-462, 2024 WL 5671151, at *11 (M.D. Pa. Apr. 29, 2024) ("[W]hile prolonged or indefinite solitary confinement may give rise to a protected liberty interest, Pennsylvania district courts have found that 11 or fewer months in solitary confinement does not." (citations omitted), *report and recommendation adopted*, 2024 WL 5673232 (M.D. Pa. Sept. 10, 2024). Overall, Godfrey's period in restrictive custody in J-Block was not so atypical and harsh in

relation to the ordinary incidents of prison life to constitute a deprivation of a protected liberty interest.

Furthermore, even if Godfrey had a protectable liberty interest at stake here, he received constitutionally sufficient process. Godfrey's segregation in J-Block occurred during the COVID-19 global pandemic, and "prison officials had to make decisions about inmate health and safety, and it was fully within their discretion to conclude that segregating unvaccinated inmates from the rest of the inmate population was a legitimate means of controlling the spread of the virus." *Williams v. Sorber*, No. 23-cv-2982, 2024 WL 2111935, at *8 (E.D. Pa. May 10, 2024), *aff'd*, No. 24-2046, 2025 WL 1419716 (3d Cir. May 16, 2025). Godfrey remained in in restricted housing with other unvaccinated inmates from September 21, 2021, until May 2, 2022. (Doc. 41-9 at 10–11.) He was notified in "under five days" upon his move to J-Block that all unvaccinated prisoners were being moved to J-Block and would be housed there until further notice. (*Id.* at 11, 32–33.) Godfrey was repeatedly told that if he took the vaccine, he would be removed from J-Block. (*Id.* at 34; *see also* Docs. 1-3 at 1 (informing Godfrey that if he "[go]t vaccinated" the conditions he was complaining about would "no longer [be] an issue"); 1-10 at 1 (responding to Godfrey's Inmate Request to Staff in which Godfrey complained about the conditions in J-Block by informing

Godfrey that if he "g[o]t vaccinated . . . [he] can enjoy all the privileges [he] wrote about")). Godfrey also had access to the grievance system as evidenced by grievances he filed pertaining to his medical issues (*id.* at 24). He also apparently believed that he could file a grievance pertaining to his prison conditions as evidenced by the text of the alleged November 5th Grievance.

As both the Eastern and Western District Courts have concluded about essentially the same process for the segregation of unvaccinated state prisoners during the COVID-19 pandemic, "[i]t is unclear what additional process under the circumstances would have accomplished." *Williams*, 2024 WL 2111935, at *8; *see Rush v. Wetzel*, No. 21-cv-316, 2025 WL 2696477, at *11–12 (W.D. Pa. Sept. 22, 2025) (agreeing with *Williams*). Godfrey also does "not specify what process, in addition to what [he was] given, [he was] allegedly due." *Rush*, 2025 WL 2696477, at *12. Regardless, the process Godfrey received was "sufficient to account for the interests at stake under the circumstances because the prison had an interest in preventing the spread of Covid and keeping inmates safe, and inmates were given the opportunity to either take the vaccine or, if they could not do so, accept more restrictive housing." *Williams*, 2024 WL 2111935, at *8. Accordingly, even if

Godfrey exhausted his procedural due process claim, the Court would grant Defendants' motion for summary judgment on this claim.

### 4. Godfrey's State-Law IIED Claim

Godfrey also has a pending state-law IIED claim against Defendants. (Doc. 22 at 9–10.) However, due to the Court's resolution of Godfrey's Section 1983 claims, there is currently no viable federal claim before the Court supporting the exercise of supplemental jurisdiction over his state-law IIED claim. *See* 28 U.S.C. 1367(c)(3); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("[I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."); *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (stating that "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so"). The Court finds that consideration of "judicial economy, convenience, and fairness to the parties" does not "provide an affirmative justification" for retaining jurisdiction over Godfrey's IIED claim. *See Hedges*,

204 F.3d at 123. Therefore, the Court will decline to exercise supplemental jurisdiction over Godfrey's state-law negligence claim.[10]

There is also no independent basis for jurisdiction over this state-law claim pursuant to the diversity jurisdiction statute, 28 U.S.C. §1332(a). Godfrey does not sufficiently allege the citizenship of the parties insofar as he pleads only his place of incarceration and Defendants' places of employment. *See Washington v. Hovensa LLC*, 652 F.3d 340, 344 (3d Cir. 2011) (stating that an individual is a citizen of the state where they are domiciled, meaning the state where they are physically present and intend to remain indefinitely); *Pierro v. Kugel*, 386 F. App'x 308, 309 (3d Cir. 2010) (unpublished) ("[T]he domicile of a prisoner before [their] imprisonment presumptively remains [their] domicile during [their] imprisonment."). Accordingly, the Court will dismiss Godfrey's IIED claim without prejudice to him refiling it in the appropriate Pennsylvania forum.

## IV.    CONCLUSION

For the foregoing reasons, the Court will grant Defendants' motion for summary judgment as it relates to Godfrey's Section 1983 claims against

---

[10] 42 Pa. C.S. §5103 provides the process that a litigant can follow to ensure that their claims dismissed in federal court can be transferred (by the litigant, not by the court) to state court to preserve the statute of limitations on any claim.

them in his amended complaint. The Court will also decline to exercise supplemental jurisdiction over Godfrey's remaining state-law IIED claim and, consequently, dismiss that claim without prejudice to Godfrey reasserting it in the appropriate Pennsylvania state court. An appropriate Order follows.


_s/ Malachy E. Mannion_
**MALACHY E. MANNION**
**United States District Judge**

**DATE: September 30, 2025**
22-0892-01